

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-17-1999

# In Re: Advanta Corp

Precedential or Non-Precedential:

Docket 98-1846

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"In Re: Advanta Corp" (1999). *1999 Decisions.* Paper 156.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/156

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 17, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1846

IN RE: ADVANTA CORP. SECURITIES LITIGATION

        Steven B. Shaiman; Richard Molison;
        James Law; Saul A. Schwartz;* Diane Sklar;*
        Theresa Wai; Stephen Wai; Claude Wells;*
        Benjamin Axler; Marilyn Axler; Jerry Weinberg,
        Appellants

* (Pursuant to F.R.A.P. 12(a))

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 97-cv-04343
(Honorable Ronald L. Buckwalter)

Argued March 9, 1999

Before: MANSMANN, SCIRICA and NYGAARD,
Circuit Judges

(Filed June 17, 1999)

        ARTHUR R. MILLER, ESQUIRE
          (ARGUED)
        1545 Massachusetts Avenue
        Cambridge, Massachusetts 02138

        DEBORAH R. GROSS, ESQUIRE
        Law Offices of Bernard M. Gross
        1500 Walnut Street, 6th Floor
        Philadelphia, Pennsylvania 19102

JOSHUA H. VINIK, ESQUIRE
Milberg, Weiss, Bershad, Hynes &
 Lerach
One Pennsylvania Plaza, 49th Floor
New York, New York 10119

 Attorneys for Appellants

JEROME J. SHESTACK, ESQUIRE
 (ARGUED)
JAY A. DUBOW, ESQUIRE
MATTHEW A. WHITE, ESQUIRE
LAURA E. KRABILL, ESQUIRE
Wolf, Block, Schorr & Solis-Cohen
Packard Building, 12th Floor
111 South 15th Street
Philadelphia, Pennsylvania 19102

 Attorneys for Appellees,
 Advanta Corp., Dennis J. Alter,
 Alex Hart, William Rosoff, Gene S.
 Schneyer and John J. Calamari

ARTHUR E. NEWBOLD, ESQUIRE
 (ARGUED)
HOPE M. FREIWALD, ESQUIRE
MICHAEL E. BAUGHMAN, ESQUIRE
Dechert, Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania 19103

 Attorneys for Appellees,
 Robert A. Marshall and Richard A.
 Greenawalt

OPINION OF THE COURT

SCIRICA, Circuit Judge.

This is a securities class action lawsuit brought by shareholders of Advanta Corporation against the corporation and several of its officers. Plaintiffs allege the defendants made false and misleading statements and

2

material omissions regarding the company's earnings potential and value of its stock, in violation of the Securities and Exchange Act of 1934. The District Court granted Advanta's motion to dismiss for failure to meet the pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. S 78u-4 et seq. (West Supp. 1999) (the "Reform Act"). We will affirm.

BACKGROUND

Plaintiffs are former shareholders of Advanta Corporation ("Advanta"), a leading issuer of MasterCard and VISA credit cards. Advanta forged its reputation in the credit card industry by innovating the practice of attracting new customers with unusually low introductory interest rates, known as "teaser rates," which remain in effect for a limited period of time, often six months. At the end of this period, the interest rate returns to a higher, permanent level. During the early and mid-1990s, Advanta used this practice to achieve rapid growth and earn large profits.

The focus of this litigation concerns a $20 millionfirst-quarter loss that Advanta announced on March 17, 1997. According to plaintiffs' complaint, the loss was caused by Advanta's decision to implement aggressive techniques to attract new credit card customers. Specifically, plaintiffs allege Advanta began issuing cards with lower teaser rates and longer introductory periods than standard industry practice, resulting in riskier customers and, ultimately, a decrease in revenues as many of the new customers defaulted on their repayment obligations. The increased delinquency rates produced greater "charge-offs," which are the costs incurred by the credit card company when a card holder's balance becomes uncollectible.

Plaintiffs claim Advanta officers failed to disclose these practices despite knowledge of the risks involved, even after it became clear that losses were inevitable, and simultaneously made various statements that allegedly were false or materially misleading. Much of plaintiffs' complaint focuses on a statement made by Janet Point, Advanta's Vice President for Investor Relations, in a September 12, 1996 Dow Jones article. The article reads in

3

part, "Over the next six months Advanta will experience a large increase in revenues as it converts more than $5 billion in accounts that are now at teaser rates of about 7% to its normal interest rate of about 17%, said Advanta spokeswoman Janet Point." This statement ("the Point statement") allegedly contradicts a subsequent statement by Dennis Alter, Advanta's chairman and former CEO ("the Alter statement"). In a June 1997 article entitled "House of Cards" that appeared in Philadelphia Magazine, Alter was quoted as saying: "[W]hat happened is when the introductory period ended, we were probably not as aggressive as we could have been [repricing our rates] . . . . Instead of repricing to 18 percent we repriced closer to 13 or 14 percent in order to retain our image and the luster of being a low-cost provider." Plaintiffs allege the Alter statement proves the Point statement was false and misleading, because the Point statement appears to indicate that Advanta was planning to reprice its teaser rates to 17 percent, yet the Alter statement apparently reveals that Advanta repriced to only 13 or 14 percent.

In addition, plaintiffs identify various statements portraying Advanta in what plaintiffs believe was an unduly positive light. These "positive portrayals" include the following statements, among others:

(1) Advanta's 1996 third-quarter report states in part: "Our track record underscores our commitment to excel . . . [Advanta is] a rapidly growing customer financial services enterprise . . . . [D]espite challenging industry environment, we are pleased to report that Advanta produced continued, consistent earnings growth in the third quarter. . .. [F]or the fifth consecutive year, return on equity has met or exceeded the 25% level achieved this quarter."

(2) In a Form 10-Q filed on November 12, 1996, Advanta stated: "The changes in the delinquency and charge-off rates from year-to-year . . . reflect the trend in unsecured credit quality which is being experienced throughout the credit industry."

(3) Announcing a shareholder dividend on November 13, 1996, Advanta released a statement reading in part, "[T]his dividend increase reflects management's confidence in the

4

company's earnings momentum and Advanta's continuing commitment to enhancing shareholder value."

(4) On January 21, 1997, Advanta chairman Dennis Alter stated, "I am pleased to report that in 1996, Advanta maintained the growth of its current businesses and accelerated its expansion into new ventures."

According to plaintiffs, these statements were made with knowledge that they were false and misleading, and plaintiffs relied on them in deciding to buy (or not to sell) Advanta stock. Consequently, the complaint alleges that the positive portrayals constitute a violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5.

In addition, one of the plaintiffs, Jerry Weinberg, alleges that two of the individual defendants, Richard Greenawalt and Robert Marshall, traded large blocks of Advanta stock contemporaneously with Weinberg while in possession of material, nonpublic information, violating section 20(A) of the Exchange Act. According to the complaint, Greenawalt sold Class A and B stock on December 6, 1996; Marshall sold Class A and B stock on December 9, 1996; and Weinberg purchased Class A stock on December 9, 1996. The complaint does not allege that either defendant traded stock directly with Weinberg, only that the trading was sufficiently contemporaneous to warrant relief under section 20(A).

On December 17, 1997, plaintiffs filed a complaint naming Advanta and seven of its present and former officers and directors as defendants. Count I of the complaint alleges the defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C.A. S 78j(b) (West Supp. 1999), and Rule 10b-5 promulgated thereunder, 17 C.F.R. S 240.10b-5 (1998), for the Point statement and the positive portrayals. Count II, based on the same factual allegations, asserts the liability of the individual defendants under section 20(a) of the Exchange Act. Count III asserts Weinberg's section 20(A) claim of contemporaneous trading against individual defendants Greenawalt and Marshall.

The District Court granted defendants' motions to dismiss all three counts. See In re Advanta Corp. Sec. Litig.,

5

No. 97-CV-4343, mem. op. at 23-24 (E.D. Pa. July 9, 1998). Specifically, the District Court held that Count I's claims based on the Point statement and the positive portrayals failed to meet the pleading requirements imposed by Fed. R. Civ. P. 9(b) and the Reform Act. The court dismissed these claims without prejudice and granted 30 days' leave for plaintiffs to amend their complaint. The court also dismissed without prejudice Counts II and III, holding that they were derivative of Count I.[1] Rather than amend their complaint, plaintiffs elected to file a Notice of Intention to Stand on the Complaint, which the District Court construed as a request to dismiss the remaining claims with prejudice. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 278 (3d Cir. 1992) ("[A] plaintiff can convert a dismissal with leave to amend into a final order by electing to stand upon the original complaint."). By an order entered September 18, 1998, the District Court denied plaintiffs' request and this appeal followed.

ANALYSIS

A. Applicable Pleading Requirements

At the outset, we must determine the effect of the Reform Act on the pleading requirements governing securities fraud lawsuits, particularly with respect to pleading scienter. Plaintiffs argue the Reform Act codified the standard developed by the Court of Appeals for the Second Circuit in Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987) and subsequent cases, and adopted by this Court in In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997). Under the Second Circuit standard, a plaintiff must plead facts supporting a "strong inference" that the defendant acted with the requisite scienter, by alleging either "facts establishing a motive to commit fraud and an opportunity to do so" or "facts constituting circumstantial evidence of either reckless or conscious behavior." In re Time Warner Inc. Sec. Litig., 9

_____

1. Count I also contained a claim based on statements regarding changes to Advanta's charge-off policy. The District Court dismissed the claim with prejudice under Fed. R. Civ. P. 12(b)(6). Plaintiffs do not appeal this part of the ruling.

F.3d 259, 269 (2d Cir. 1993). Defendants argue the Reform Act establishes a pleading standard that is more stringent than all previously existing standards, including the Second Circuit's.

To date, two federal courts of appeals have concluded without analysis that the Reform Act codified the Second Circuit standard. See Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 537–38 (2d Cir. 1999); Williams v. WMX Techs., Inc., 112 F.3d 175, 178 (5th Cir. 1997). Numerous district courts have considered the issue, with split results. A majority have held the Reform Act essentially codified the Second Circuit's approach.2 Others, including a district court of this circuit, have held the Act imposes an even more stringent pleading standard.3 The most notable case is In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746 (N.D. Cal. 1997), in which the court conducted a detailed examination of the legislative history and prior case law before concluding that allegations of "[m]otive, opportunity, and non–deliberate recklessness" are no longer"sufficient to support scienter unless the totality of the evidence creates a strong inference of fraud." See id. at 757.

The Reform Act requires a plaintiff alleging a Rule 10b–5 violation to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C.A. S 78u–4(b)(1) (West Supp. 1999). 4 Regarding scienter, or knowledge, section 21D(b)(2) of the Reform Act provides:
_____

2. See Richard H. Walker & J. Gordon Seymour, Recent Judicial and Legislative Developments Affecting the Private Securities Fraud Class Action, 40 Ariz. L. Rev. 1003, 1025 n.124 & accompanying text (1998) (citing and discussing cases).

3. See Voit v. Wonderware Corp., 977 F. Supp. 363, 374 (E.D. Pa. 1997).

4. Pub. L. No. 104–67, 109 Stat. 743, 758.

> In any private action arising under this chapter in
> which the plaintiff may recover money damages only on
> proof that the defendant acted with a particular state
> of mind, the complaint shall, with respect to each act
> or omission alleged to violate this chapter, state with
> particularity facts giving rise to a strong inference that
> the defendant acted with the required state of mind.

Id. S 78u-4(b)(2). Failure to meet these requirements will result in dismissal of the complaint. See id. S 78u-4(b)(3)(A). Complaints alleging securities fraud must also comply with Rule 9(b), which provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).[5]

Although the Reform Act's "strong inference" language mirrors the Second Circuit's, the precise extent to which Congress intended to adopt the Second Circuit standard is not clear. The Reform Act's legislative history on this point is ambiguous and even contradictory. The purpose of the Act was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys. See H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 748.

The bill originally proposed in the House of Representatives would have altered both the procedural and the substantive requirements governing claims under Rule 10b-5. Procedurally, House Bill 10 provided that a complaint alleging securities fraud must plead "specific facts" demonstrating that the defendant acted with the

_____

5. Rule 9(b)'s provision allowing state of mind to be averred generally conflicts with the Reform Act's requirement that plaintiffs "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C.A. S 78u-4(b)(2) (West Supp. 1999). In that sense, we believe the Reform Act supersedes Rule 9(b) as it relates to Rule 10b-5 actions.

requisite scienter. H.R. 10, 104th Cong. S 204 (1995).
Substantively, the bill would have eliminated recklessness
as a basis for satisfying the scienter element in securities
fraud liability. See id. After hearings in the House
Subcommittee on Telecommunications and Finance,
however, House Bill 10 was revised to reinstate and define
recklessness as a basis for liability.6  The revised bill,
designated House Bill 1058, also contained a seemingly
more stringent pleading standard: It required the complaint
to "make specific allegations which, if true, would be
sufficient to establish scienter as to each defendant at the
time the alleged violation occurred." H.R. 1058, 104th
Cong. S 4 (1995). Rejecting a proposed amendment that
would have weakened the pleading requirement, the House
retained this language in the final version of the bill, which
was passed in March 1995.

Soon thereafter, the Senate passed its own version of the
Reform Act. The Senate bill required plaintiffs to allege
"specific facts demonstrating the state of mind of each
defendant at the time the alleged violation occurred." S.
240, 104th Cong. S 104 (1995). In its report of the bill to
the full Senate, the Senate Committee on Banking, Housing
and Urban Affairs described its pleading standard as
follows:

> The Committee does not adopt a new and untested

_____

6. The definition of recklessness was the subject of considerable debate
on the House floor. Ultimately, House Bill 1058 defined recklessness as
follows:

> (4) Recklessness.––For purposes of paragraph (1), a defendant
> makes a fraudulent statement recklessly if the defendant, in making
> such statement, is guilty of highly unreasonable conduct that (A)
> involves not merely simple or even gross negligence, but an extreme
> departure from standards of ordinary care, and (B) presents a
> danger of misleading buyers or sellers that was either known to the
> defendant or so obvious that the defendant must have been
> consciously aware of it. Deliberately refraining from taking steps
to
> discover whether one's statements are false or misleading
> constitutes recklessness, but if the failure to investigate was not
> deliberate, such conduct shall not be considered reckless.

141 Cong. Rec. H2863-64 (daily ed. Mar. 8, 1995).

pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit. Regarded as the most stringent pleading standard, the Second Circuit requires that the plaintiff plead facts that give rise to a "strong inference" of defendant's fraudulent intent. The Committee does not intend to codify the Second Circuit's case law interpreting this pleading standard, although courts may find this body of law instructive.

S. Rep. No. 98, 104th Cong., 1st Sess., at 15 (1995). During the subsequent floor debate, the Senate considered an amendment closely tracking the language of the Second Circuit pleading standard and case law. The amendment, proposed by Senator Specter, provided:

For purposes of paragraph (1), a strong inference that the defendant acted with the required state of mind may be established either--

(A) by alleging facts to show that the defendant had both motive and opportunity to commit fraud; or

(B) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness by the defendant.

141 Cong. Rec. S9170 (daily ed. June 27, 1995). Senator Specter expressly noted that his amendment was based on Second Circuit case law, particularly Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46 (2d Cir. 1987). See id. at S9171 (statement of Sen. Specter). He further stated: "This is just basic fundamental fairness that if you take the Second Circuit standard, you ought to take the entire standard . . . ." 141 Cong. Rec. S9200 (daily ed. June 28, 1995) (statement of Sen. Specter). The Specter amendment was passed by a vote of 57 to 42, see id. at S9201, and Senate Bill 240 was passed on June 28, 1995, see id. at S9219.

The differences between the House and Senate versions of the Reform Act were addressed by a Committee of Conference, which released its report on November 28, 1995. The accompanying "Statement of Managers" recited

10

that the purpose of the Reform Act was to create uniformity among the circuits and "establish . . . more stringent pleading requirements to curtail the filing of meritless lawsuits." H.R. Conf. Rep. No. 104-369, at 37 (1995). It further stated:

> Heightened pleading standard
>
> . . .
>
> The Conference Committee language is based in part on the pleading standard of the Second Circuit. The standard also is specifically written to conform the language to Rule 9(b)'s notion of pleading "with particularity."
>
> Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.

Id. The accompanying footnote stated: "For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness," an apparent reference to Second Circuit case law interpreting the pleading requirements for scienter. Id. n.23; cf. Time Warner, 9 F.3d at 269 (holding that a plaintiff must allege either "facts establishing a motive to commit fraud and an opportunity to do so" or "facts constituting circumstantial evidence of either reckless or conscious behavior").

President Clinton vetoed the Reform Act on the grounds that it imposed excessively stringent pleading requirements:

> I believe that the pleading requirements of the Conference Report with regard to a defendant's state of mind impose an unacceptable procedural hurdle to meritorious claims being heard in Federal courts. I am prepared to support the high pleading standards of the U.S. Court of Appeals for the Second Circuit -- the highest pleading standard of any Federal circuit court.

11

But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.

141 Cong. Rec. H15214 (daily ed. Dec. 20, 1995) (veto message of President Clinton). Subsequently, both houses of Congress overrode the President's veto and the Reform Act was enacted into law without changes to the pleading standard.

Complicating matters further, Congress recently enacted the Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105–353 ("the Standards Act"). Though the Standards Act does not modify or amend the text of the Reform Act, its Conference Report states: "It is the clear understanding of the managers that Congress did not, in adopting the Reform Act, intend to alter the standards of liability under the Exchange Act." H.R. Conf. Rep. No. 105–803, at 13 (1998); see also S. Rep. No. 182, at 11 (1998) ("The managers understand . . . that certain Federal district courts have interpreted the Reform Act as having altered the scienter requirement. In that regard, the managers again emphasize that the clear intent in 1995 and our continuing intent in this legislation is that neither the Reform Act nor [the Standards Act] in any way alters the scienter standard in Federal securities fraud suits."). The Senate Report reiterates that the Reform Act "establishes a heightened uniform Federal standard on pleading requirements based upon the pleading standard applied by the Second Circuit Court of Appeals." Id. Despite these statements, however, we do not believe the Standards Act resolved the uncertainty. In both the House and Senate floor debate on the Standards Act, legislators continued to disagree whether the Reform Act codified the Second Circuit standard.7 Furthermore, the Supreme Court has

_____

7. The Federal Securities Law Reports observe:

Responding to confusion over the pleading standard imposed by the Reform Act, proponents of the Uniform Standards Act took the opportunity to restate and clarify what Congress intended in 1995. The Managers' Statement on the Uniform Standards Act. . . explained that the 1995 Act did not alter the standards of liability under the Exchange Act but that it did establish a heightened,

12

instructed that "the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute." Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 185 (1994). Consequently, our interpretation of the Reform Act is unaffected by the legislative history of the Standards Act.

Ultimately, we believe there is little to gain in attempting to reconcile the conflicting expressions of legislative intent, including the President's veto statement. The legislative history on this point is contradictory and inconclusive, and we are reluctant to accord it much weight. Accordingly, we direct our attention to the Reform Act's plain language, which is the customary starting point in statutory interpretation. The text of section 21D(b)(2) closely mirrors language employed by the Second Circuit, particularly as it requires the plaintiff to allege facts supporting a"strong inference" of scienter. In fact, with the exception of the Act's "state with particularity" requirement, the two standards are virtually identical. Cf. 15 U.S.C.A. S 78u–4(b)(2) (plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Plaintiffs must also allege facts that give rise to a strong inference of scienter."). We believe Congress's use of the Second Circuit's language compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Circuit. Because the Second Circuit standard was regarded as the most restrictive prior the Reform Act, this interpretation is consistent with Congress's stated intent of

_____

uniform federal standard for pleading scienter based on the 2nd U.S. Circuit Court of Appeals standard. The debates over the earlier House and Senate bills largely echoed this view and included remarks that the Reform Act specifically adopted the 2nd Circuit standard. Other remarks, however, suggested that Congress intended a pleading standard higher than the 2nd Circuit's. Thus, despite Congress' efforts to clarify its intent, some uncertainty may still persist.

1844 Federal Sec. L. Rep. 2 (Nov. 11, 1998).

13

strengthening pleading requirements and deterring frivolous securities litigation. In many jurisdictions, adoption of a "strong inference" standard will substantially heighten the barriers to pleading scienter, a result Congress expressly intended. Moreover, even in jurisdictions already employing the Second Circuit standard, the additional requirement that plaintiffs state facts "with particularity" represents a heightening of the standard. This language echoes precisely Fed. R. Civ. P. 9(b) and therefore requires plaintiffs to plead "the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (quoted in Burlington Coat Factory, 114 F.3d at 1422).

Although the Reform Act established a uniform pleading standard, it did not purport to alter the substantive contours of scienter. Under the heading "Requirements for securities fraud actions," the Act expressly characterizes subsections 21D(b)(1) and (b)(2) as imposing "pleading requirements." 15 U.S.C.A. S 78u-4(b)(3)(A) (West Supp. 1999). On this point, the legislative history is uncontradicted and reinforces the view that these provisions impose strictly procedural requirements. The Statement of Managers notes "this legislation implements needed procedural protections to discourage frivolous litigation," an explicit reference to the procedural nature of the Reform Act. H.R. Conf. Rep. No. 104-369 at 28 (1995). It also states that section 21D(b)(2) imposes a "heightened pleading standard" in response to disparate interpretations of Fed. R. Civ. P. 9(b), a procedural rule. See id. at 37 ("[Rule 9(b)] has not prevented abuse of the securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits."). Likewise, the floor debate and committee reports in both houses of Congress, as well as the President's veto statement, all describe the Reform Act as imposing new "pleading requirements." In view of the statutory language and supporting legislative history, we believe section 21D(b)(2) was intended to modify procedural requirements while leaving substantive law undisturbed.8

--------------------------------------------------------------------------------

8. As noted, the Silicon Graphics court interpreted the Reform Act to eliminate allegations of motive, opportunity, and non-deliberate

14

Accordingly, we hold that it remains sufficient for plaintiffs plead scienter by alleging facts "establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." Weiner v. Quaker Oats Co., 129 F.3d 310, 318 n.8 (3d Cir. 1997); accord Press, 166 F.3d at 538 (same). Motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must now be supported by facts stated "with particularity" and must give rise to a "strong inference" of scienter. 15 U.S.C.A. S 78u-4(b)(2) (West Supp. 1999). These heightened pleading requirements address the previous ease of alleging motive and opportunity on the part of corporate officers to commit securities fraud. Permitting blanket assertions of motive and opportunity to serve as a basis for liability under the Exchange Act would undermine the more rigorous pleading standard Congress has established. After the Reform Act, catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.

As for recklessness, we reiterate our previous holding that it remains a sufficient basis for liability. See Burlington Coat Factory, 114 F.3d at 1418. Retaining recklessness not only is consistent with the Reform Act's expressly

_____

recklessness as independent bases for scienter. See 746 F. Supp. at 757 ("Motive, opportunity, and non-deliberate recklessness may provide some evidence of intentional wrongdoing, but are not alone sufficient to support scienter unless the totality of the evidence creates a strong inference of fraud."). The court relied largely on the Act's legislative history, particularly the Conference Committee's deletion of the Specter amendment. See H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, at 41 n.23 ("For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness."). But if Congress had desired to eliminate motive and opportunity or recklessness as a basis for scienter, it could have done so expressly in the text of the Reform Act. In our view, the fact that Congress considered inserting language directly addressing this line of cases, but ultimately chose not to, suggests that it intended to leave the matter to judicial interpretation.

15

procedural language, but also promotes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud. A reckless statement is one " `involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979) (quoting Sunstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)). We also note that scienter may be alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.

We now turn to the particulars of plaintiffs' complaint.

B. The Point Statement

Plaintiffs contend the Point statement subjects Advanta to liability under section 10(b) of the Exchange Act, which makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C.A. S 78j(b) (West Supp. 1999). Rule 10b-5, in turn, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. S 240.10b-5(b) (1998). These provisions create a private right of action for plaintiffs to recover damages for "false or misleading statements or omissions of material fact that affect trading on the secondary market." Burlington Coat Factory, 114 F.3d at 1417; see also In re Craftmatic Sec. Litig., 890 F.2d 628, 639 (3d Cir. 1989) (federal securities law recognizes a right of action for omitting material facts that would assume significance in the deliberations of a reasonable shareholder).

16

The Reform Act establishes a safe harbor protecting certain "forward-looking" statements from Rule 10b-5 liability. See 15 U.S.C.A. S 78u-5 (West Supp. 1999). Regarding statements made by natural persons (as opposed to business entities), the Act provides that a forward-looking statement is shielded by the safe-harbor provision unless the plaintiff proves it was made with "actual knowledge . . . that the statement was false or misleading." Id. S 78u-5(c)(1)(B)(i). The District Court held the Point statement was forward-looking and qualified for protection under the Act because "[p]laintiffs' catch-all allegation that all speakers knew their statements were false when made is too broad and Alter's comments indicate nothing more than Advanta's failure to follow through exactly as planned on its proposed interest increase, rather than purposeful intent to fool the public." Advanta, mem. op. at 23. The Advanta shareholders contend that the Point statement was not forward-looking, and that even if it was, it was made with actual knowledge of its false and misleading nature and therefore does not qualify for protection.

Under the Reform Act, a statement is forward-looking if, inter alia, it is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C.A. S 78u-5(i)(1)(A) (West Supp. 1999). The first portion of the Point statement reads, "Over the next six months Advanta will experience a large increase in revenues. . . ." In our view, this portion of the statement clearly qualifies as "a projection of revenues" and therefore is forward-looking. The remaining portion of the statement, "as [Advanta] converts more than $5 billion in accounts that are now at teaser rates of about 7% to its normal interest rate of about 17%," is a statement of Advanta's plan to reprice its teaser-rate accounts to a rate of about 17%. We believe this part of the statement is forward-looking as well, because it is "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." Id. S 78u-5(i)(1)(B). Consequently, we hold that the entire Point statement is "forward-looking" within the meaning of the Act.

17

Nonetheless, the safe harbor will not apply if the statement was made with "actual knowledge" that the statement was false or misleading. Id. S 78u-5(c)(1)(B)(i). Plaintiffs argue the falsity of the Point statement is proved by Dennis Alter's subsequent comment that "we were probably not as aggressive as we could have been[repricing our rates] . . . . Instead of repricing to 18 percent we repriced closer to 13 or 14 percent in order to retain our image and the luster of being a low-cost provider." Because Point was Advanta's spokesperson, plaintiffs argue, she must have possessed actual knowledge that Advanta was not repricing to 17 percent, but only 13 or 14 percent, at the time the statement was made. Plaintiffs further contend that even if Point did not possess actual knowledge, the failure of Advanta's executives to repudiate the statement constituted a ratification of it.

The complaint does not plead any specific facts to support an inference that Point, or anyone else at Advanta, had actual knowledge of her statement's falsity. The complaint's only specific factual allegation regarding the falsity of the Point statement is the existence of the Alter statement some nine months later. But the Point statement and the Alter statement are not inconsistent: Point stated in September 1996 that Advanta planned to reprice its teaser rates to 17%; nine months later, Alter expressed regret that Advanta did not reprice to that level. Even assuming the two statements referred to precisely the same accounts, it does not follow that Point's statement was false: Advanta may have intended to reprice the accounts to 17 percent at the time of the Point statement and subsequently changed its business strategy. As the defendants point out, Advanta owed no duty to update the Point statement. See 15 U.S.C.A. S 78u-5(d) (West Supp. 1999) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement."); Burlington Coat Factory, 114 F.3d at 1433 ("[T]he voluntary disclosure of an ordinary earnings forecast does not trigger any duty to update.").9 At best, comparison of the Point and

_____

9. We also reject plaintiffs' argument that the Alter statement, along with proposed corrective measures announced by Advanta in the wake of the $20 million loss, constitute "admissions" of securities fraud liability. If this were so, all companies that suffer losses and then publicly discuss how they plan to improve earnings in the future would be guilty of admissions that they defrauded investors.

18

Alter statements suggests that Advanta made a series of unwise business decisions in its attempt to attract new customers. But section 10(b) does not " `regulate transactions which constitute no more than internal corporate mismanagement.' " Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977) (quoting Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971)).

Plaintiffs' complaint fails to plead any other facts supporting an inference that the Point statement was made with "actual knowledge" of its falsity. Accordingly, we believe the statement was protected by the safe-harbor provision for forward-looking statements.

C. The "Positive Portrayals"

Next, we consider whether plaintiffs adequately pleaded a cause of action relating to the "positive portrayals" made by Advanta and its officers. To state a securities fraud claim under section 10(b) and rule 10b-5, a private plaintiff must plead the following elements: "(1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage." In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir. 1996).

Plaintiffs' amended complaint identifies a number of representations alleged to satisfy these criteria. In addition to those set forth above (upon which the District Court focused its analysis), the complaint identifies the following statements:

(1) An April 1996 letter to shareholders, signed by defendants Hart, Alter, Greenawalt and Rosoff, stated:

> Advanta's credit quality continues to be among the best in the industry. Our emphasis on gold cards -- and targeting of high quality customer prospects with great potential for profitability -- sets us apart from other credit card issuers.
>
> * * *
>
> The Company is among the most efficient producers in the credit card industry. Our superior cost structure

19

for delivering and servicing financial products allows us to achieve outstanding returns with highly competitive pricing and flexibility.

(Pls.' Am. Compl. P 35.) The letter also touted Advanta's strengths, including "an experienced management team, technological expertise . . . and expanding distribution channels." (Id.)

(2) Advanta's 1995 Annual Report included the following representations regarding the quality of its credit portfolio:

While we added substantially to our account base, our credit quality remained excellent.

* * *

Our emphasis on gold cards -- and targeting of better quality customers -- helps us maintain an enviable credit quality profile. Gold cards made up 82% of our credit card balances in 1995, nearly double the industry average.

(Id. P 36.) The 1995 Annual Report also referred to Advanta's "risk-adjusted pricing strategy" in which "credit cards are issued with lower rates to customers whose credit quality is expected to result in a lower rate of credit losses." (Id.)

(3) A July 18, 1996 letter to shareholders, again signed by defendants Alter, Hart, Greenawalt and Rosoff, stated that "[d]espite industry-wide pressure on credit card asset quality, Advanta continued to produce better-than-industry credit measures, and achieved excellent growth and returns throughout our core businesses." (Id.P 37.)

(4) A Form 8-K filed with the SEC on October 17, 1996 and signed by defendant Schneyer stated, "The Company's credit card asset quality statistics continue to be better than industry averages." (Id. P 50.)

According to plaintiffs, these statements (as well as those set forth supra, Part I) were materially false and misleading because they failed to disclose the deterioration in credit quality allegedly caused by Advanta's aggressive efforts to attract new customers. The District Court held the statements do not prove Advanta intentionally misled or

20

defrauded investors, but only that profits failed to live up to expectations. See Advanta, mem. op. at 19. Consequently, the court rejected plaintiffs' arguments as "attempts to plead fraud by hindsight." Id.

Rule 10b-5 liability does not attach merely because "[a]t one time the firm bathes itself in a favorable light" but "[l]ater the firm discloses that things are less rosy." DiLeo, 901 F.2d at 627. Rather, the plaintiff must demonstrate that the loss was attributable to the defendant's fraudulent conduct. As noted, the Reform Act requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. S 78u-4(b)(1) (West Supp. 1999). Furthermore, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. S 78u-4(b)(2) (West Supp. 1999).

The complaint here alleges that during the time period in which Advanta issued the positive portrayals, the company implemented policies relaxing its underwriting and monitoring procedures and "superior credit risk customers were switching to other credit card companies at rates that would have a materially negative impact on the Company's reported earnings." (Pls. Am. Compl. P 46.) Elsewhere, it alleges that Advanta changed its methodology for computing bankruptcy charge-offs without promptly disclosing this change to the marketplace, see id. PP 46, 48, 50; that Advanta repriced its teaser rates to 13 or 14 percent rather than its normal rate of 17 percent, causing a substantial decline in revenues, id. P 47; and that Advanta lacked adequate collection capability to support the expansion in its customer base, id.P 52. According to plaintiffs, the juxtaposition of these alleged facts against the positive portrayals shows that the statements were materially misleading when made.

We disagree. Even assuming plaintiffs' allegations are true, the positive portrayals do not contradict any of defendants' other statements but merely report previous successes and express confidence in Advanta's prospects

21

for future growth. Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b). See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) ("[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.") Similarly, vague and general statements of optimism "constitute no more than `puffery' and are understood by reasonable investors as such." Burlington Coat Factory, 114 F.3d at 1428 n.14; see also San Leandro Emergency Med. Plan v. Phillip Morris Co., 75 F.3d 801, 811 (2d Cir. 1996); Shapiro, 964 F.2d at 283 n.12. Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material: there is no "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); see also Craftmatic, 890 F.2d at 642 (holding that "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions" are "soft information" and hence immaterial for purposes of Rule 10b-5). The representations identified by plaintiffs fall entirely into these categories: accurate reports of past earnings, and non-actionable expressions of optimism for the future. We are skeptical that plaintiffs or any other reasonable investors would make investment decisions based on the positive portrayals.

Even if the positive portrayals were materially misleading, we believe the complaint suffers a more fundamental defect in that it fails to satisfy the Reform Act's requirements for pleading scienter. Rather than state with particularity facts supporting a strong inference that defendants possessed the requisite scienter, plaintiffs offer conclusory assertions that the defendants acted "knowingly," Pls. Am. Compl. PP 22, 42, 51, as well as blanket statements that defendants must have been aware of the impending losses by virtue of their positions within the company, see id. PP 19, 22, 23. It is well established that a pleading of scienter "may not rest on a bare inference that a defendant `must have had' knowledge of the facts." Greenstone v. Cambex Corp., 975 F.2d 22, 26 (1st Cir. 1992) (Breyer, J.)

22

(quoting Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir.1986)). Likewise, allegations that a securities-fraud defendant, because of his position within the company, "must have known" a statement was false or misleading are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998). Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company. See Rosenbloom v. Adams, Scott & Conway, Inc., 552 F.2d 1336, 1338-39 (7th Cir. 1977) ("A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information necessarily attaches to those positions."). In re Ancor Communications, Inc. Sec. Litig., 22 F. Supp. 2d 999 (D. Minn. 1998), relied upon by plaintiffs, does not suggest otherwise. There the court inferred that key officers were aware their product would likely prove incompatible with the products of another company with whom Ancor had entered into a supply contract. The court expressly based its holding on the facts that the contract "was undeniably the most significant contract in Ancor's history," thus supporting an unusually strong inference of scienter, and that plaintiffs' complaint also cited extrinsic evidence such as discussions among officers regarding product incompatibility and an escape clause in the supply agreement governing this contingency. Id. at 1005. Such considerations are not present here.

Plaintiffs also argue that even if defendants did not intentionally mislead investors, they recklessly disregarded negative trends in the credit card industry and in Advanta's customer base, and therefore possessed the requisite scienter. In particular, plaintiffs contend the positive portrayals were reckless in light of industry-wide increases in personal bankruptcies and charge-offs, especially as exacerbated by Advanta's alleged decisions to reprice introductory rates to only 13 or 14 percent and to relax underwriting and monitoring practices. We disagree. For purposes of the scienter requirement of Section 10(b) and Rule 10b-5, we have adopted Sunstrand's definition of a reckless statement as one " `involving not merely simple, or

23

even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " McLean, 599 F.2d at 1197 (quoting Sunstrand, 553 F.2d at 1045); accord In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989). Plaintiffs' allegations, even if true, would not demonstrate an "extreme departure" from the standards of ordinary care. At most, the complaint demonstrates that Advanta embarked on a business strategy of aggressively recruiting new customers without adequately accounting for the increased risk this endeavor posed. None of the facts in the complaint suggests this strategy represented an egregious departure from the range of reasonable business decisions, as opposed to simple mismanagement. But "claims essentially grounded on corporate mismanagement are not cognizable under federal law." Craftmatic, 890 F.2d at 638–39. Accordingly, we find that the positive portrayals do not support a strong inference of recklessness.

The complaint's remaining allegation regarding scienter is that several of the individual defendants -- most prominently, Richard Greenawalt, Dennis Alter, Robert Marshall, and Gene Schneyer -- sold large blocks of their Advanta stock during November and December 1996, approximately three months before the $20 million loss was announced to the marketplace. (See Pls. Am. Compl. P 69.) Plaintiffs allege these transactions suggest defendants knew of the impending first-quarter loss or at least had the motive and opportunity to commit fraud. The complaint sets forth the dates, numbers of shares, and proceeds of the sales. (See id.)

We have held that "[w]e will not infer fraudulent intent from the mere fact that some officers sold stock." Burlington Coat Factory, 114 F.3d at 1424; accord San Leandro, 75 F.3d at 814 ("[T]he sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent . . . ."); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 (1st Cir. 1996) ("[T]he mere fact that insider stock sales occurred does not suffice to establish scienter."). But if the stock sales were unusual in scope or

24

timing, they may support an inference of scienter. See Burlington Coat Factory, 114 F.3d at 1424; Shaw, 82 F.3d at 1224 ("[A]llegations of `insider trading in suspicious amounts or at suspicious times' may permit an inference that the trader -- and by further inference, the company -- possessed material nonpublic information at the time.") (quoting Greenstone, 975 F.2d at 26). In Burlington Coat Factory, we found the stock sales did not permit an inference of scienter because only three of thefive defendants sold stock, plaintiffs provided information on the total stock holdings of only one defendant who had traded only 0.5 percent of his holdings, and plaintiffs failed to plead facts indicating whether such trades were"normal and routine" for the defendants and whether the trading profits were substantial in comparison to their overall compensation. See 114 F.3d at 1423.

Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported. See Acito, 47 F.3d at 54 (holding that lack of sales by several defendants "undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit") (internal quotation marks omitted). In addition, although the complaint fails to provide information on the percentage of total holdings sold by the defendants, it appears the defendants who did trade stock during the class period sold only small percentages of their holdings. According to Form 4s that were filed with the SEC and attached to Advanta's motion to dismiss, Schneyer and Alter sold only 7 percent and 5 percent, respectively, of their total holdings.10 Alter, in particular, continued to hold a sizable percentage of Advanta's outstanding stock even after the 1996 sales. Far from supporting a "strong inference" that defendants had a motive to capitalize on artificially inflated stock prices, these facts suggest they had every incentive to keep Advanta profitable. See

_____

10. Although similar information is not available with regard to the other individual defendants, Advanta has no duty to provide it; rather, the burden is on the plaintiffs to plead facts supporting an inference of scienter.

25

Burlington Coat Factory, 114 F.3d at 1422 n.12 (finding no motive and opportunity because plaintiffs failed to explain "how a temporary inflation of . . . stock price would help management increase its compensation or preserve its jobs"); Wallace v. Systems & Computer Tech. Corp., No. 95-CV-6303, 1997 WL 602808, at *17 (E.D. Pa. Sept. 23, 1997) (same).

Nor were the sales at issue particularly large in comparison to the individual defendants' previous trading practices. The complaint alleges that Greenawalt, Alter, Marshall, and Schneyer sold a total of 1,023,766 shares during the eight-month class period, as compared to 580,814 during the previous 28 months. It makes no reference to the previous trading practices of the other individual defendants. Although the profits realized by the defendants were significant relative to their base salaries, these proceeds were the result of accumulated stock options and were an intended part of their overall compensation package. (See Pls. Am. Compl.PP 11-16.) As we recognized in Burlington Coat Factory, "[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events." 114 F.3d at 1424 (citation omitted).

Thus, we hold that the allegations concerning defendants' stock transactions do not permit a strong inference of scienter, as required by the Reform Act.11  Nor have plaintiffs alleged other specific facts supporting such an inference. Consequently, we believe the claims relating to positive portrayals fail to comply with statutory pleading requirements and were correctly dismissed.

D. Contemporaneous Trading

One of the individual plaintiffs, Jerry Weinberg, alleges that two of the individual defendants, Greenawalt and Marshall, traded large blocks of Advanta stock contemporaneously with Weinberg while in possession of

_____

11. Because the complaint fails to meet the pleading requirements of the Reform Act, we need not address whether it also fails to meet the requirements of Fed. R. Civ. P. 9(b).

26

material, nonpublic information, violating section 20(A) of the Exchange Act. According to the complaint, Greenawalt sold Class A and B stock on December 6, 1996; Marshall sold Class A and B stock on December 9, 1996; and Weinberg purchased Class A stock on December 9, 1996.

Section 20(A) of the Exchange Act provides that an insider who trades stock "while in possession of material, nonpublic information" is liable to any person who traded contemporaneously with the insider. 15 U.S.C.A.S 78t-1(a) (West Supp. 1999). Liability under section 20(A) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." Id. Hence, claims under section 20(A) are derivative, requiring proof of a separate underlying violation of the Exchange Act. See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994) ("[T]o state a claim under S 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations."); In re Verifone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993) (noting that if plaintiffs "have failed to allege an actionable independent underlying violation of the '34 Act, they similarly cannot maintain a claim under S 20A"). Because plaintiffs have failed to plead a predicate violation of Section 10(b) or Rule 10b-5, the section 20(A) claim must also be dismissed.

CONCLUSION

The District Court correctly dismissed plaintiffs' claim based upon the Point statement because the statement was protected by the Reform Act's safe-harbor provision. The remaining claims in Count I failed to comply with the pleading requirements of the Reform Act, and the section 20(A) claim is derivative of Count I. Accordingly, these claims were properly dismissed as well.

We will affirm the judgment of the District Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit