**In re HONEYWELL INTERNATIONAL INC. SECURITIES LITIGATION.**

No. Civ. 99–2231(DRD).

United States District Court, D. New Jersey.

Jan. 15, 2002.

Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrman & Knopf LLP, Saddle Brook, NJ, liason counsel.

Williams S. Lerach, Arthur C. Leahy, Kathleen A. Herkenhoff, Denise M. Douglas, Alexandra S. Bernay, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, for plaintiffs.

John J. Francis, Jr., Drinker, Biddle & Shanley, LLP, Florham Park, NJ, Yosef J. Riemer, Sarah Slover, Kirkland & Ellis, New York City, for Honeywell International, Inc.

Jonathan J. Lerner, Skadden Arps, Slates, Meagher & Flom LLP, New York City, Michael R. Bonsignore, Giannantonio Ferrari, Donald J. Redlinger, Robert D. Johnson, Richard F. Wallman, Peter M. Kreindler, James T. Porter, for defendants.

## OPINION

DEBEVOISE, Senior District Judge.

This is a securities class action on behalf of all purchasers of the stock of Honeywell International Inc. ("Honeywell") between December 20, 1999 and June 19, 2000 (the "Class Period"), asserting claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5. The defendants Honeywell and seven of its senior officers (the "Individual Officers"), have moved to dismiss the consolidated complaint (the "Complaint") and plaintiffs have moved to strike exhibits submitted in support of defendants' motion to dismiss the complaint and all references thereto.

Defendants' motion will be granted in part and denied in part. Plaintiffs' motion will be denied as moot.

## I. *The Complaint*

Defendants challenge the Complaint, claiming that rather than being a "short and plain statement of the claim" in conformity with Fed.R.Civ.P. 8 it is "puzzle pleading" that fails to meet the requirements of Rule 9(b) and the Private Securities Litigation Reform Act (the "Reform Act"). The Complaint certainly is not short, but if it is a puzzle, it is meant for a child and can be assembled readily. The issues are whether plaintiffs plead actionable misrepresentations with sufficient particularity and whether plaintiffs adequately plead scienter on the part of Honeywell and each Individual Officer.

There is pled one overarching misrepresentation and omission, namely the financial success or failure of the Honeywell–Allied Signal, Inc. ("Allied") merger. There are pled a number of subsidiary individual misrepresentations and omissions alleged to be components of the overarching misrepresentation and omission. A summary of the allegations of the complaint follows:

In early 1999 Honeywell and Allied announced that they would merge, creating a huge 12,000 employee, $20 billion per year world wide conglomerate. ¶ 2. The combined companies would sell aerospace products and services, control technologies for buildings, homes and industry, specialty chemicals, fibers and plastics, and electronic and advanced materials. *Id.* The combined entities would be known as Honeywell and would have four strategic business units: Aerospace Solutions, Automation & Controls, Performance Materials, and Power and Transportation Products. *Id.*

The top executives of the merged company are the Individual Officers: Michael

R. Bonsignore was Honeywell's CEO and Chairman of its Board; Giannantonio Ferrari was its President and COO; Donald J. Redlinger was its Senior Vice President— Human Resources; Robert D. Johnson was its Executive Vice President and COO—Aerospace Businesses; Richard F. Wallman was its Senior Vice President and Chief Financial Officer, Peter M. Kreindler was a Senior Vice President and General Counsel; and James T. Porter was a Senior Vice President—Information and Businesses Services. ¶ 22.

The merger became effective on December 1, 1999. ¶ 2. The investment community was skeptical of the merger fearing that it would be difficult to integrate successfully the two companies' far-flung and diverse operations and to achieve immediately significantly accelerated revenue and earnings per share ("EPS") growth in 2000–2001 which Bonsignore had been representing would occur after the merger. ¶ 3.

Thus Bonsignore and his management team were under great pressure to show the merger succeeding, that promised merger synergies and savings were being achieved, and that Honeywell would immediately achieve strong EPS gains due to both accelerated internal growth and acquisitions, thus pushing Honeywell's stock price higher. ¶ 5. In addition the Individual Officers were under an additional pressure in that their compensation was tied directly to Honeywell's EPS, revenue growth and stock price—they would receive millions in compensation only if Honeywell's EPS, revenue and stock price increased to certain target levels. ¶¶ 5, 39. An increased stock price would also allow the Individual Officers to sell hundreds of thousands of shares of their personal Honeywell stockholdings at a huge profit. ¶¶ 5, 44.

Throughout the Class Period (December 20, 1999 – June 19, 2000) the Individual Officers and, through them, Honeywell, made it appear as though the merger was highly successful and that new Honeywell was doing very well. The defendants repeatedly represented that the integration of Allied and old Honeywell was going very well; that integration was on or ahead of schedule; that the merger would cause substantial operational synergies and $750 million in cost savings during 2000–2002—$250 million more than they had earlier predicted; that the merger would generate $250 million in cost savings in 2000 alone and that merger synergies and savings would accelerate as 2000 unfolded. ¶¶ 6–8, 57, 64–64, 75, 81–83, 94, 96, 99.

Defendants announced that Honeywell had "record" financial results for the fourth quarter in 1999, year end 1999 and first quarter 2000 due in part to a strong performance by Honeywell's Home and Building Control business. ¶¶ 64, 82. They represented that Honeywell would have an impressive EPS for 2000, and that Honeywell would have EPS growth of 20% in 2000, 17% in 2001 and 15% in 2002, with a compounded growth of 18% going forward. ¶¶ 57, 64–65, 78, 82–83. They represented that Honeywell would also have free cash flow of $1.9 billion in 2000. ¶¶ 90, 96.

Defendants represented that Honeywell's post-merger growth-by-acquisition strategy was going well, as they had acquired a company named Pittway Corp. They represented that the acquisition of Pittway was a success and would not dilute Honeywell's EPS growth in 2000, but would boost Honeywell's cash flow during 2000 and would materially boost EPS in 2001–2002. ¶¶ 65, 96, 99.

Defendants represented that Honeywell's Performance Materials unit, which was previously slumping, had been turned around because Honeywell had implement-

ed price increases which "were holding up well." ¶¶ 65, 71, 90–92, 96.

The Complaint alleges that these representations created the illusion that Honeywell was doing well post-merger, achieving record financial results and poised for 18% compound EPS growth. In truth, the complaint alleges, the facts were otherwise.

Contrary to proceeding successfully, defendants were encountering serious and persistent problems integrating and continuing the operation of the two companies ¶¶ 29–23. There were major problems combining the financial and accounting systems and controls and obtaining financial information necessary to forecast accurately Honeywell's operations. This resulted in increased costs and no merger synergies. ¶¶ 12(n)–(o).

In addition, in connection with the merger, there were huge reductions in workforce and many key sales personnel were laid off. As a result, new Honeywell was losing significant orders from customers who were reluctant to sign contracts because of the chaos created by the massive layoffs. Honeywell lost $200–$500 million in contracts from customers that decided not to purchase because of the layoff-related chaos. ¶ 72(p). The merger was also adversely affecting new Honeywell because defendants had used "pooling" accounting for the merger, which prohibited it from selling off four money-losing, poorly-performing businesses (polymers, chip packaging, pharmaceuticals/Specialty Chemicals and friction materials) which were adversely affecting Honeywell's financial results. ¶¶ 12(p), 29, 63(p), e.g., 72(q).

Further, the Pittway acquisition was not a success as represented by defendants, but rather was having a negative effect on Honeywell. While defendants were making positive statements about Pittway, they were aware of contradicting facts,

such as that Pittway had artificially inflated its revenues and profits by creating millions of dollars of sales on commercially unreasonable terms to uncreditworthy customers, which created over $200 million in past due and difficult to collect receivables, and that this adversely affected Honeywell's 2000 cash flow (as opposed to boosting it as defendants represented the Pittway acquisition would). e.g., ¶ 12(e).

Defendants knew that attempts to integrate Pittway were not going well. By February 2000 and March 2000, several Pittway managers had left, its sales had fallen by almost 50%, there was an upsurge in past due accounts receivable, and Pittway's revenues and profits were significantly below forecasts, due, in part, to three large customers (ADT, Protection One and Chubb) curtailing purchases or buying lower-margin items, thus causing Pittway to be dilutive to Honeywell's 2000 EPS, contrary to defendants' representations. e.g., ¶ 12(f)–(h).

With respect to the Performance Materials unit, the announced price increases were not holding up well but were being met with extreme customer resistance, contrary to defendants' representations. While some customers were initially paying the increased prices, they did so only under protest, and were simultaneously seeking alternate sources of supply. e.g., ¶ 12(b). Most customers were rejecting the price increases outright because the unit's products had become commodities on which Honeywell had lost the ability to raise prices. e.g., ¶ 12(c). As a result, Honeywell was losing many customers and had to give its remaining customers' secret discounts and price concessions to keep them, thus adversely affecting revenue and profits. This, combined with increasing raw materials costs, was destroying the unit's margins, had an adverse effect on Honeywell's financial results, and was pre-

venting Honeywell from achieving its 2000 EPS growth forecasts. e.g., ¶ 12(b)–(c).

There were other undisclosed problems which defendants covered up so that they could perpetuate the illusion that new Honeywell was thriving. For example, while defendants publicly represented that Honeywell's Aerospace Solutions Unit was doing well (¶ 8) and would contribute strongly to Honeywell's 2000 EPS ¶¶ 64–65, 91, they contemporaneously knew that the unit (which accounted for 37% of Honeywell's sales and was its most profitable unit) was suffering from serious and persistent problems in obtaining printed circuit boards ("PCBs") from an outsourced supplier named EFTC, as well as electronic control units ("ECUs"), to meet demand from Boeing and other aircraft OEM customers. ¶¶ 12(i), 63(i), 72(i), 80(i), 93(i), 102(i). Defendants were aware that these shortages would not be fixed until at least the fourth quarter 2000, and would prevent Honeywell from meeting its projected EPS for 2000. *Id.*

Defendants also concealed that Honeywell's Power & Transportation Products unit was troubled. The unit had weak sales of its friction materials, serious component shortages for Honeywell's important new Turbocharger products, and sharply lower truck builds, especially in Europe. e.g., ¶ 12(j). These products caused the unit to perform below expectations, delayed the ramp-up of the new Turbocharger products (causing the loss of $80–100 million on this operation) and adversely affected Honeywell's financial results. *Id.* At the same time Honeywell was experiencing these shortages which delayed the ramp-up of the Turbocharger products that caused the loss of $80–100 million in sales, defendants falsely told the public that revenue growth in 2000 would come from Turbocharger sales and that they expected a successful roll-out of the products. ¶¶ 64, 97.

Defendants also concealed other problems which were adversely affecting Honeywell's performance: the Specialty Chemicals business was performing poorly. It had lost its competitive position (especially for its Naproxin drug) and had $40–60 million in losses. It was doing so poorly that Honeywell was going either to abandon or sell it. e.g., ¶ 12(k). Still, defendants represented that revenue growth in 2000 would come from Specialty Chemicals. ¶ 64. Similarly, Honeywell's chip packaging manufacturing operation was troubled. Its pilot manufacturing operation for Honeywell's ASTI technology had failed because it was unable to produce commercial yields of product. This caused $40–60 million in losses and later resulted in a $100 million write-off. e.g., ¶ 12(1). Contrary to these facts, defendants represented that this operation would contribute to 2000 revenue growth. ¶ 64. Defendants also concealed and did not disclose that Honeywell had sold hundreds of millions of dollars of products on special, unusual terms—including extended payment terms—in first quarter 2000 in order to artificially boost its revenues for that quarter. As a result, Honeywell had accumulated over $400 million in past due receivables which was adversely affecting its cash flow and causing it to be lower than forecast. e.g., ¶ 12(m).

In order to cover up all of these problems which were negatively affecting Honeywell's financial results, defendants deliberately falsified Honeywell's financial statements issued during the Class Period in violation of Generally Accepted Accounting Principles ("GAAP"). ¶¶ 12(q), 72(r), 80(r), 93(r), 108–29. Rather than accurately report the financial problems described above, defendants manipulated Honeywell's revenues, expenses and reserves, and failed to make important disclosures (*id.*), in order to report falsely that Honey-

well was achieving **"record"** financial results (¶¶ 64, 82), when in fact it was not.

Defendants caused Honeywell's Home and Building Control business to create phony revenue by recording revenue from fictitious clients and non-existent jobs, by billing customers for work that had not been performed, and by abusing the "percentage of completion" method of recognizing revenue through prematurely accruing revenue. ¶¶ 110–20. Defendants also deliberately understated Honeywell's expenses through the Home and Building Control business by holding invoices from suppliers and subcontractors while not recording or paying those invoices and by shifting current period costs from sales to lease jobs, which costs were then amortized over five to ten years, thereby drastically and improperly reducing Class Period expenses. *Id.* Defendants also boosted Honeywell's first quarter 2000 EPS by improperly reversing millions of dollars of merger reserves-excessive reserves that should not have been set in the first place, and which had no purpose other than to allow defendants a reservoir to draw down on to secretly pump up Honeywell's first quarter 2000 results. ¶¶ 121–24. Furthermore defendants had imposed price increases on customers of Honeywell's Performance Materials unit. While this led to a very short term increase in revenues, defendants knew that the increase would only last during first quarter 2000, as customers were rejecting the price increases and would be buying elsewhere in the next quarter, thus leading to a huge decline in future quarters' sales. ¶¶ 125–29. Notwithstanding a duty to make disclosures warning investors of this development under SEC rules and GAAP, defendants did not do so. *Id.*

Because of these many problems defendants knew that their forecasts of EPS, EPS growth and cash flow were false when made, as Honeywell could not attain such results. ¶¶ 12(r)–(s), 63(q)–(r), 72(s)–(t), 80(s)–(t), 93(s)–(t), 102(r)–(s).

Defendants' positive statements, and their concealment of adverse facts, caused Honeywell's stock price to soar. By April 25, 2000, Honeywell's stock price reached $58 7/16 per share (very close to its Class Period high of $59 1/8). ¶¶ 9, 101. The strong upward movement in Honeywell's stock price was remarkable given that stocks generally declined very sharply during April 2000. ¶ 9. However, notwithstanding their representations that new Honeywell was succeeding and was supposedly on track to achieve several years of accelerating revenue and EPS growth, which presumably would lead to further increases in Honeywell's stock price, defendants Bonsignore, Ferrari, Redlinger, Johnson, Porter and Kreindler, six of the seven Individual Officers, unloaded more than 338,000 shares of their personal stockholdings, selling most of it as the stock approached its then Class Period high in late April 2000, pocketing more than $18 million in illegal trading proceeds. ¶¶ 10, 44.

Having completed the sale of 338,000 plus shares in April 2000, defendants in June of that year began disclosing a less happy picture of the state of the merger. On Monday, June 19, 2000 they disclosed that Honeywell would miss its second quarter 2000 EPS forecasts. They attributed this failure to component parts shortages for Honeywell Aerospace operations, which hurt revenues and the adverse impact of rising oil prices and interest rates on its other operations. The investment community recognized that there must be much more serious difficulties with the merger, but Honeywell declined to provide more detailed information until an analysts' conference to be held July 10, 2000. Honeywell's stock had already declined from $59 1/8 on June 2 to $48 33/64 on

Friday June 16. It dropped to $40 1/2 at the close of June 19 and was $34 11/16 at the close of June 23. Between June 2, 2000 and June 23, 2000 Honeywell lost $16.87 billion in market capitalization. ¶ 103.

At a July 10, 2000 investors' conference Honeywell's Bonsignore admitted:

> Honeywell's entire management team is painfully aware that it has a credibility gap to overcome. Bonsignore would be the first to admit that Honeywell did not react as quickly as a fully integrated company might have to compensate for Honeywell's delayed and lost revenue or income disappointments. Honeywell's second quarter 2000 cash flow was $339 million down from $513 million in second quarter 1999. This shortfall was driven primarily by poor performance in working capital turnover, particularly receivables. Honeywell had accumulated $400 million in past due receivables.
>
> In polymers Honeywell had encountered significant volume erosion, more than offsetting the price increases that Honeywell announced. Honeywell was not able to achieve its attempted price increases in its nylon and polyester business. The absence of pricing power in these businesses was striking at a time when raw material prices moved higher to record levels. Honeywell had seen a commoditization of polyester over the last few years, at the same time the raw materials trended upward. This business would be disposed of.
>
> Honeywell's pharmaceuticals business fell considerably short of expectations. Honeywell had invested heavily here, but lost a lot of money on some high-volume generic drugs which were being displaced by competition. This business would be disposed of.
>
> Over the last three years, Honeywell had attempted to create proprietary technologies relating to the interface between the semiconductor and the circuit board. This investment did not yield sufficient returns due to Honeywell's inability to achieve commercial yields of this product. Honeywell had to close its large-scale pilot manufacturing operation for chip packaging, taking a $100+ million pre-tax write-off.
>
> In automation and control, Honeywell's second quarter 2000 revenue was lower than expected. Honeywell's newly acquired fire and security unit's (Pittway) revenue growth declined from low double-digits in the first quarter to mid-single digits in the second quarter. The slowdown resulted from several Pittway customers, like ADT and Protection One, repricing the low-end of the security market in anticipation of higher installation costs and attrition rates. Honeywell had hoped Pittway would be non-dilutive for the year, but it was dilutive in the first half of 2000.
>
> In aerospace, Honeywell's revenue contracted by 3% during the second quarter. Honeywell had less revenue growth than forecast, primarily due to a problem with a supplier in Honeywell's Aerospace Electronics Systems business. Honeywell made a decision a year earlier to out-source its printed circuit card to a vendor, the vendor was unable to meet Honeywell's commitments in the second quarter 2000 and the resulting parts shortages impacted Honeywell's ability to make these shipments.
>
> Honeywell missed its second quarter 2000 forecast not because of one or two problems, but due to disappointments in several of Honeywell's segments.
>
> The complexity of simultaneously achieving ambitious financial goals, integrating two very large and complex companies and dealing with performance shortfalls with several of Honeywell's business units left Honeywell with no

margin for error. This situation was a combination of overly aggressive objectives and a confluence of factors working against Honeywell simultaneously.

The complaint sets forth in considerable detail a chronological account of the manner in which the false and misleading statements were fed to the investment community and the public.

There was an initial meeting with securities analysts and investors in New York City held on December 20, 1999 which Bonsignore, Ferrari, Wallman, Redlinger, Johnson and Porter attended. At the conference and subsequent break-out sessions the Honeywell executives announced and discussed in highly positive terms Honeywell's acquisition of Pittway, the status of the Allied Signal–Honeywell merger, the synergies and savings arising from the merger and Honeywell's expected EPS growth in fiscal year 2000. ¶ 57. Based on the meeting and follow-up conversations with Bonsignore. Ferrari or Wallman a number of investment houses issued highly favorable reports about Honeywell's prospects and the likely success of the merger. ¶¶ 58–62. The reports rendered at the meeting and the information transmitted to the investment advisers were false and misleading for the reasons previously stated. ¶ 63(a)–(r).

On January 19, 2000 Honeywell issued a release reporting its fourth quarter 1999 and 1999 results. This was followed up with a conference telephone call with analysts, money and portfolio managers, institutional investors and large stockholders. Again the false statements about Honeywell's and the merger's prospects were repeated. ¶ 65.

On February 23, 2000 Honeywell filed with the SEC its Form 10–K which falsified its 1999 financial results. ¶ 74. Between February 23, 2000 and March 31, 2000 Warburg Dillon Read, Merrill Lynch and Sanford C. Bernstein issued glowing reports about Honeywell based on extensive discussions with Bonsignore, Ferrari or Wallman. These three Individual Officers reviewed the reports before they were issued. They contained many of the misrepresentations referred to above. ¶¶ 75–77.

On March 31, 2000 Honeywell issued its highly bullish 1999 Annual Report. It included a letter that Bonsignore had prepared highlighting "A Merger Made in Heaven." ¶ 78 A Merrill Lynch Report of April 5, 2000 relied heavily on the Annual Report. ¶ 79. The Annual Report was false and misleading for the reasons previously noted. ¶ 80.

On April 13, 2000 Honeywell issued a release containing the same positive statements and predictions. ¶ 82. Honeywell followed up the release with a telephone conference call with analysts, investors and others at which Bonsignore maintained the same false positions. Bonsignore, Ferrari or Wallman conducted telephone conferences with a number of investment houses as a result of which their statements were incorporated in reports of Sanford C. Bernstein & Co., Salomon Smith Barney, Warburg Dillon Read, Lehman Brothers, PNC Institutional Investment Service, Prudential Securities, J.P. Morgan and Merrill Lynch. ¶¶ 85–92. The statements contained in the April 13, 2000 release and the statements Bonsignore, Ferrari and Wallman made to the investment advisers and investors as reflected in the reports of the investment houses were false and misleading for the reasons previously given. ¶ 93.

Honeywell held its annual meeting on May 1, 2000 at which enthusiasm for the merger and Honeywell's future prospects was maintained. ¶ 94.

On May 9, 2000 Bonsignore appeared at a conference of investors and analysts in New York City. He pictured at a formal

presentation and break-out sessions the same positive evaluation of the merger's success and Honeywell's future prospects as described above. ¶ 96. This and subsequent conversations produced favorable reports issued by two investments houses, Sanford C. Bernstein & Co. and Merrill Lynch. ¶ 97, 98.

On June 7, 2000 Bonsignore appeared at an investment/analyst conference in New York City. Even at that late date in a formal presentation and in break-out sessions he told the analysts, money and portfolio managers, institutional investors, brokers and stock traders that:

The merger integration of "old" Honeywell and Allied was successful. Thus, "new" Honeywell would achieve substantial operation synergies and at least $250 million in merger savings in 2000 alone. The merger synergies and savings could accelerate as 2000 unfolded.

Honeywell was on track to achieve second quarter 2000 EPS of $.78.

Honeywell would achieve EPS growth of at least 20% in 2000 to $3.25 followed by at least 17% EPS growth in 2001 and compounded EPS growth of at least 18% over the next three years.

Honeywell's EPS growth would accelerate as 2000 unfolded.

Honeywell's acquisition of Pittway was a success. The Pittway acquisition would not dilute Honeywell's 2000 EPS and would add to Honeywell's 2001–2002 EPS. ¶ 99.

After further discussions with Bonsignore and Ferrari only J.P. Morgan is alleged to have written a report. The report stated:

Honeywell shares are down sharply today, following a steep decline yesterday. We are unable to find anything Honeywell specific that would explain such a drop, and attribute the fall to general sector weakness. Honeywell was speaking at a conference yesterday, though we understand from attendees that the presentation contained no surprises ... Our own view is that the fundamentals here remain on an improvement track, and we have a positive outlook on earnings in coming quarters. The merger integration is going quite well, and we should begin to see significant contribution from these savings in the second half of this year. After checking in with management, we remain comfortable that results in the current quarter will meet our expectations. ¶ 100.

The statements made between May 1, 2000 and June 8, 2000 were false when made for the reasons previously stated ¶ 102(a)–(s). There followed on June 19 and thereafter the disclosures that revealed that the success of the merger and Honeywell's prospects had been seriously misrepresented. As a result Honeywell's stock price fell precipitately. ¶ 103.

## II. *Discussion*

A. *Legal Standard:* A securities fraud claim is subject to heightened pleading requirements both under Fed.R.Civ.P. 9(b) and also under the Reform Act. Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Because § 10(b) and Rule 10b–5 are anti-fraud provisions, plaintiffs must plead them with the particularity required by Rule 9(b). *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997).

The Reform Act places additional burdens on plaintiffs attempting to plead fraud in securities cases. The Act requires a plaintiff alleging a Rule 10b–5 violation to,

specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C.A. § 78u–4(b)(1) (West Supp. 2001). Regarding scienter, or knowledge, section 21(D)(b)(2) of the Reform Act provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*Id.* § 78u–4(b)(2). Failure to meet these requirements will result in dismissal of the complaint. *Id.* § 78u–4(b)(3)(A).

■ The leading Third Circuit Court of Appeals case on the subject of the Reform Act is *In re Advanta Corp. Securities Litigation,* 180 F.3d 525 (3d Cir.1999). There the Court noted that "[a]lthough [the Reform Act] established a uniform pleading standard, it did not purport to alter the substantive contours of scienter." *Id.* at 534. The United States Supreme Court established the meaning of "scienter" for the purposes of Rule 10b–5 claims in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) as a "mental state embracing intent to deceive, manipulate, or defraud." Thereafter lower courts held that scienter could be established through allegations of reckless conduct. The Court of Appeals for the Third Circuit defined "recklessness" as conduct involving "not merely simple, or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the [defendant] must have been aware of it."

*McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979).

In *Advanta* the court stated, "[a]s for recklessness, we reiterate our premise holding that it remains a sufficient basis for liability." *Id.* at 535. Moreover, *Advanta* also stated that " . . . it remains sufficient for plaintiffs [to] plead scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.' " *Id.* at 534–35. Reflecting the heightened pleading requirements imposed by the Reform Act, *Advanta* continued:

> Motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must now be supported by facts stated "with particularity" and must give rise to a "strong inference" of scienter. 15 U.S.C.A. § 78(u)–4(b)(2) (West Supp. 1999). These heightened pleading requirements address the previous ease of alleging motive and opportunity on the part of corporate officers to commit securities fraud. Permitting blanket assertions of motive and opportunity to serve as a basis for liability under the Exchange Act would undermine the more rigorous pleading standard Congress has established. After the Reform Act, catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.

*Id.* at 535. Thus to establish scienter on the basis of motive and opportunity a plaintiff must also provide support in "facts stated 'with particularity' which give rise to a 'strong inference' of scienter." *Id.*

As in any case on a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiffs' complaint, construe the complaint in the light most favorable to the plaintiffs, and determine whether, "under any reasonable reading of the pleadings, the plaintiff[s] may be entitled to relief." *Colburn v. Upper Darby Township,* 838 F.2d 663, 665–66 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) (citations omitted). The court, however, need not accept as true legal conclusions or unwarranted factual inferences. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A complaint is properly dismissed only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Id.* at 45, 78 S.Ct. 99.

B. *Material Misrepresentations:* Plaintiffs allege that the Honeywell Defendants named in the consolidated complaint are liable for securities fraud under § 10(b) of the Exchange Act, 15 U.S.C.A. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, for knowingly or recklessly making material misstatements or omissions in conjunction with the preparation and disclosure of Honeywell's financial data. Plaintiffs contend that these false statements artificially inflated Honeywell's stock price, that they would not have otherwise purchased the stock at the prices they paid, and that they suffered monetary damages as a result.

To prevail ultimately on the merits, plaintiffs must show that: (i) Defendants made a misstatement or omission; (ii) of a material fact; (iii) with scienter; (iv) in connection with the purchase or sale of securities; (v) upon which plaintiffs relied; and (vi) that reliance proximately caused plaintiffs' losses. *See In re Westinghouse Securities Litigation,* 90 F.3d 696, 710 (3d Cir.1996); *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995). The first, second and third prongs of this analysis are at issue on the present motions.

Plaintiffs allege that the Honeywell Defendants intentionally or recklessly made false and misleading statements in furthering a fraudulent scheme for the sale of Honeywell stock without disclosing adverse information known to them (¶ 23). Plaintiffs allege that the scheme (i) deceived the investing public; (ii) artificially inflated the price of Honeywell stock during the class period; (iii) caused plaintiffs and other members of the class to purchase Honeywell stock at inflated prices; while, (iv) the Individual Defendants sold a large percentage of their shares at inflated prices. (*Id.*).

The precise misrepresentations and omissions alleged to have been made are set forth in detail in the above summary of the complaint and in greater (and unnecessarily repetitious) detail in the complaint itself. Defendants advance a number of reasons why the complaint fails to allege actionable misrepresentations. These reasons will be addressed in turn.

First, defendants contend that defendants' rosy view of the future was no more than misguided optimism, which does not give rise to a cause of action. *See In re Carter Wallace, Inc., Sec. Litig.,* 220 F.3d 36, 42 (2d Cir.2000). Defendants are correct that a company and its officers do not commit fraud and should not have to defend a lawsuit simply because their predictions about the future turn out to be wrong. *In re Donald J. Trump Casino Sec. Litig.,* 793 F.Supp. 543, 556 (D.N.J. 1992). It may be that when all the facts are assembled on discovery that the early projections made in December 1999 and January 2000 will be found to have been simply misguided optimism. However, they are alleged to have been knowing

misrepresentations when made, and as one difficulty followed another and when defendants never so much as tempered this optimism, it can be inferred that in due course it was no longer misguided optimism—it was deliberate deceit.

■ Second defendants challenge the complaint on the ground it is "puzzle pleading." They criticize the complaint on the one hand because it is not a "short and plain statement of the claim" and they criticize it on the other hand because it lacks sufficient detail. The complaint is certainly not short, nor could it be considering the complex nature of the financial and operational matters upon which it relies. It could have been fashioned more simply to eliminate the deadening repetition of the "true facts" which were allegedly concealed. However, that is not a ground for dismissal and it cannot be characterized as a "great web of scattered, vague, redundant and often irrelevant allegations." *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1243 (N.D.Cal.1998).

Third, defendants charge that the complaint fails to specify any facts to support those allegations that are pled on information and belief. The complaint does not allege any facts as being on information and belief; rather it forthrightly asserts its allegations. Defendants contend that where plaintiffs do not have personal knowledge, the complaint must be based on information and belief. The logical result of that proposition would be that a plaintiff would have to plead all his evidence in the complaint.

The basis of most of the allegations in the instant complaint are perfectly obvious-public records, memoranda of conferences, securities analysts' reports, public statements of the Individual Officers both before and after it was known that the merger was not working as projected. Further it is permissible to draw inferences from the known facts as will be discussed in more detail in connection with the subject of scienter.

■ Fourth, defendants charge the complaint with failure to specify why each alleged misrepresentation was misleading when made. Without going through every allegedly false statement, a few examples should demonstrate that this criticism is without foundation. From as early as December 20, 1999 Bonsignore and other Individual Officers falsely stated that the merger was successful, that integration was proceeding smoothly and would save hundreds of millions dollars and accelerate EPS growth. These falsehoods were repeated through the ensuing months when it must have been known to at least Bonsignore that the merger was not proceeding smoothly, would not save hundreds of millions of dollars and would not accelerate EPS growth.

The Pittway acquisition was a leading source of misrepresentations. Defendants stated that Pittway would be non-dilutive and beneficial to Honeywell, that Pittway integration was successful and that its business was performing up to expectations. The very opposite was true. To boost its results Pittway had artificially inflated its revenues and profits through the creation of problematic sales resulting in more than $200 million in past due receivables which Honeywell could not easily collect. The problems with Pittway as alleged in the complaint go on and on. There is ample particularity to support the charges in the complaint.

Defendants charge that the facts alleged are nothing more than hindsight identification of problems that plaintiffs now claim should have alerted defendants sooner to the possibility of an earnings shortfall. If that were the case, fraud would not have been successfully pled. *Zucker v. Quasha*, 891 F.Supp. 1010, 1014 (D.N.J.1995). The complaint pleads more than hindsight.

There are ample facts pled to support an inference that material facts known to at least some of the defendants were withheld in order to maintain the price of Honeywell's stock.

■ Fifth, defendants contend that certain of the statements that plaintiffs' claim were false and misleading are forward-looking statements that are not actionable either under the Reform Act's safe harbor provision, 15 U.S.C. § 78u–5, or the "bespeaks caution" doctrine. Under the latter, a plaintiff can claim that a forward-looking statement violates Rule 10b–5 only by alleging either that the speaker did not actually believe the forward-looking statement when made or that the speaker has no reasonable basis for the belief. That issue will be dealt with in the section dealing with scienter.

Certain of the alleged misrepresentations were forward looking—the revenue and EPS forecasts and projections of merger synergies. Most were oral, not written. Under the Reform Act's safe harbor each *particular* oral statement must be identified as forward looking. 15 U.S.C. § 78u–5(c)(2)(A)(i)–(ii) (emphasis added). None were so identified here. Further, for each written or oral forward-looking statement defendants were required to state that the actual results might differ materially from those projected and identify important factors "that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). At this stage in the proceedings it cannot be said that any of the cautionary language in the written or oral statements met this standard.

Sixth, defendants assert that the allegedly false statements concerning Honeywell's condition past and present are not actionable because plaintiffs have not alleged that they were false. I have read the complaint and find that it does in fact allege that defendants' statements regarding Honeywell's current condition and past performance are false.

C. *Scienter:* To state the conclusion, the complaint alleges scienter adequately as to Bonsignore, Ferrari and Wallman and, through them, as to Honeywell. The allegations are inadequate to sustain a charge of scienter as to the other Individual Officers.

■ The Reform Act's provisions affected in particular the pleading of scienter. The Court of Appeals for the Third Circuit has held that a plaintiff may properly plead scienter in two ways, i.e., (i) establishing a motive and opportunity to commit fraud along with particularized facts giving rise to a strong inference of scienter or (ii) by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior. *Advanta*, 180 F.3d 525 at 534–35. Both ways have been employed in the instant complaint.

■ Turning first to Bonsignore, plaintiffs rely heavily upon the existence of motive and opportunity. He had the ongoing motive to make the merger appear to be a success; his compensation depended upon his achieving specified financial targets; he held a substantial amount of stock and stock options which he sought to sell at optimum prices. He in fact did sell 80.077 shares of Honeywell stock during the class period for $4,444,375. A significant portion of the sales was in the period shortly before disclosure of the serious problems that Honeywell had accomplished. These are factors that may be considered in determining if scienter has been adequately pled, particularly when considered in combination. However, as defendants point out, alone they are insufficient.

■ Incentive compensation is a common practice, and a desire to maintain

their corporate positions is universal among corporate executives. Neither motivation can be the basis of a fraud charge. *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2nd Cir.1996). Similarly the desire to show the success of a recent transaction such as the merger is insufficient. *Phillips v. LCI International, Inc.*, 190 F.3d 609, 623 (4th Cir.1999).

■ The mere fact of trading during an alleged class period is not enough. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir.1997). It has been held that a plaintiff can rely on insider trading to establish scienter where the timing and quantities of executives' trading is "suspicious enough to support the necessary strong inference of scienter." *Id.* at 1410. Insider trading is suspicious only when it is "dramatically out of line with prior trading practices." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir.1999). The complaint does not allege what the Individual Officers' past stock sale practices were, and, in fact, defendants have presented evidence to the effect that the volume of the Individual Officers' stock sales was fairly consistent with past practices. The timing of the sales in 2000 alleged in the complaint is a factor to consider in determining if scienter has been adequately pled, but alone it is not enough.

■ In the case of Bonsignore, however, there are many additional facts which when considered in conjunction with his motivation and stock sales, constitute sufficient pleading of scienter. His actions must be viewed against the backdrop of the allegations of serious misrepresentations and omissions recounted above. He was Chief Executive Officer of Honeywell as of December 1, 1999 and became Chairman on April 1, 2000. He had full knowledge of all of Honeywell's operations. By virtue of his position he had to have known of the falsity of the representations

he and his fellow officers made. He led the numerous meetings with the investment advisors, investors and others. He continually provided misinformation to the investment houses knowing that it would be incorporated in reports to be issued to the public. It is alleged that in some instances he reviewed the reports before they were issued. Plaintiffs need not plead adoption or endorsement when they allege, as here, that certain of the Individual Officers made false statements directly to analysts that were repeated in the analysts' reports. *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.1997). In those situations where a defendant actually reviews an analyst's report before it is issued he can be said to have adopted it.

Thus in the case of Bonsignore scienter has been adequately alleged. In addition to motivations and stock sales, he enjoyed a prominent position in Honeywell which required that he have detailed knowledge of the subject matter of the misrepresentations. It was he who led the campaign to present the false picture to the investing public, making statements he knew to be false.

For similar reasons scienter on the part of Ferrari and Wallman has been alleged. Ferrari sold 57,386 shares of Honeywell stock for $3,328,388 during the Class Period. Wallman sold none. As explained above that is not the critical factor.

What is critical is the fact that each held a position in Honeywell that required that he have full knowledge of its business and financial status. Ferrari was President and Chief Operating Officer during the Class Period. Wallman was Senior Vice President and Chief Financial Officer of Honeywell during the Class Period.

Both Ferrari and Wallman joined Bonsignore at the meetings with financial advisors and investors and both of them continually provided false information to the

advisors between conferences and meetings. They too reviewed investment house reports before they were distributed to the investing community. This in its totality is sufficient to meet the Reform Act's heightened pleading requirements.[1]

 The "plus factors" establishing scienter are not present in the case of the other Individual Officers. It is alleged that during the class period Johnson sold 40,000 shares of Honeywell stock for $2,260,000. Kreindler sold 102.369 shares for $5,428,423. Porter sold 25,000 shares for $1,815,710. That, without more, is inadequate to constitute a basis for finding scienter. It is also alleged that attending the December 20, 1999 analysts' conference along with Bonsignore, Ferrari and Wallman were Redlinger, Johnson and Porter.

None of the Individual Officers other than Bonsignore, Ferrari and Wallman were in positions which would require that they have full overall knowledge of Honeywell's finances, operations and problems. Each had responsibility for an ancillary function, and without more specificity knowledge of the matters which were misrepresented cannot be attributed to them. Redlinger was Senior Vice President—Human Resources; Johnson was Executive Vice, Chief Operating Officer—Aerospace Businesses; Kreindler was Senior Vice President and General Counsel; Porter was Senior Vice President—Information and Businesses Services.

Further, other than the December 20, 1999 analysts' conference, there are no allegations that these Individual Officer participated with Bonsignore, Ferrari and Wallman in meeting with representatives of the investment community, fed misinfor-

mation at such meetings or otherwise, or reviewed investment house reports. In operations as huge and geographically extended as those of Honeywell the allegations of the Complaint are inadequate to bring into play the group pleading doctrine with respect to company officers other than Bonsignore, Ferrari and Wallman, *cf. In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir.1995).

D. *Motion to Strike:* Supporting defendants' motion to dismiss are eight exhibits attached to an affidavit. Plaintiffs moved to strike Exhibit B (1999 Proxy Statement issued by Honeywell), Exhibit E (a transcript of a Honeywell conference call with analysts on December 20, 1999) and Exhibit H (a transcript of a Honeywell conference call with analysts on April 13, 2000). It is plaintiffs' contention that apart from being unauthenticated hearsay, these documents are not referenced, quoted or incorporated in the Complaint and thus are inappropriate for consideration on a motion to dismiss under Rule 12(b)(6).

Plaintiffs may well be correct, and the court has not considered these Exhibits in deciding the motion to dismiss. The Exhibits, however, will become part of the material that will be assembled during discovery, and no useful purpose would be served by striking them at this point in the proceedings. Plaintiffs' motion will be denied as moot.

### III *Conclusion*

Defendants' motion to dismiss the complaint will be granted as to defendants Redlinger, Johnson, Kreindler, and Porter and denied as to defendant Honeywell, Bonsginore, Ferrari, Wallman. Plaintiffs' motion to strike certain Exhibits will be

---

1. Enough has been advanced to establish the adequacy of plaintiffs' pleading of scienter without a detailed analysis of plaintiffs' charges that defendants committed accounting fraud by i) improper revenue and cost recognition in the home building segment, ii) concealing problems with polymer price increases, and iii) manipulation of the merger reserve.

denied as moot. The court will enter its own order.