## In re PENN TREATY AMERICAN CORP. SECURITIES LITIGATION.

### Civil Action No. 01–1896.

United States District Court,
E.D. Pennsylvania.

May 15, 2002.

---

Marc Topaz, Michael K. Yarnoff, Schiffrin and Craig, Bala Cynwyd, PA, for plaintiff.

Geoffrey A. Kahn, Douglas L. Flitter, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for defendants.

Robert P. Frutkin, Law Offices of Bernard M. Gross, PC, Philadelphia, PA, for movants.

### *MEMORANDUM*

BUCKWALTER, District Judge.

This is a securities class action lawsuit brought by shareholders of Penn Treaty American Corporation ("Penn Treaty" or the "Company") against the Company and two of its top executives. Plaintiffs allege that during the period July 23, 2000 through and including March 29, 2001 (the "Class Period"), Defendants made false and misleading statements and material omissions regarding the Company's financial health and viability in violation of the Securities and Exchange Act of 1934 ("Exchange Act"). Count I of the Complaint alleges Defendants are liable under section 10(b) of the Exchange Act, 15 U.S.C.A. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Count II, based on the same factual allegations, asserts the liability of the individual defen-

dants under section 20(a) of the Exchange Act. Defendants move to dismiss Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, Defendants' motion is denied.

## I. Facts

Plaintiffs are shareholders of Penn Treaty, a registered insurance holding company. Through its various subsidiaries, Penn Treaty primarily engages in the underwriting, marketing and sale of individual and group accident and health insurance products, principally covering long-term nursing home and home health care. Penn Treaty's principal subsidiary is Penn Treaty Network America ("PTNA"), representing 94% of the Company's direct premiums.

By way of background, and pertinent to this litigation, each of Penn Treaty's subsidiaries is subject to the insurance laws and regulations of each state in which it is licensed to sell insurance. As long-term health insurers, Penn Treaty's insurance subsidiaries are required by state law to have statutory surplus, which is calculated using statutory accounting principles ("SAP"). Various state insurance departments have adopted risk-based capital ("RBC") requirements for insurance companies, which assist regulators in evaluating the adequacy of statutory capital and surplus in relation to investment and insurance risks. As described in the Company's 2000 Annual Report:

> The RBC formula is used by state insurance regulators as an early warning tool to identify, for the purpose of initiating regulatory action, insurance companies that potentially are inadequately capitalized. In addition, the formula defines minimum capital standards which an insurer must maintain. Regulatory compliance is determined by a ratio of the enterprise's regulatory Total Adjusted Capital, to its Authorized Control Level RBC, as defined by the NAIC. Companies below specific trigger points or ratios are classified within certain levels, each of which may require specific corrective action depending upon the insurer's state of domicile.

At the varying levels of RBC, the Company's subsidiaries are subject to the following:

> (i) Regulatory Action Level—below which a company must file a Corrective Action Plan that details the insurer's plan to raise additional statutory capital over the next four years. The plan must be approved by the state Insurance Commissioner, who may perform an audit of the insurer's financial position.
> (ii) Authorized Control Level—below which the Insurance Commissioner is authorized to take actions it considers necessary to protect the best interests of the policyholders and creditors of an insurer, which may include placing the insurance company under regulatory control, which in turn, may result in rehabilitation or, ultimately, liquidation.
> (iii) Mandatory Control Level—below which the Insurance Commissioner is required to take the actions it considers necessary to protect the best interests of the policyholders and creditors of an insurer, which include placing the insurance company under regulatory control, which in turn, may result in rehabilitation or, if deemed appropriate, liquidation.

The focus of this litigation concerns revelations of the Company's deficient statutory capital and surplus levels, which caused the Company's stock price to drop from $17.46 per share on March 29, 2001 to $3.00 per share three days later on April 3, 2001. According to Plaintiffs' Complaint, this situation was caused by Penn Treaty's decision to undergo tremen-

dous growth in sales without maintaining minimum capital levels to cover their existing claims plus expected business growth.

Plaintiffs allege that it was materially false and misleading for Penn Treaty to tout the Company's future growth prospects and assure investors that this growth was (1) not jeopardizing Penn Treaty's financial health; (2) that Penn Treaty was closely monitoring the Company's statutory capital and surplus levels; and (3) that Penn Treaty's capital and surplus were adequate for the increased level of business, because these statements were made at a time when the Company was facing regulatory intervention and insolvency as a result of its precarious financial condition.

Plaintiffs' Complaint identifies numerous statements made by Irving Levit ("Levit"), Penn Treaty's Chairman, Chief Executive Officer and President, and Cameron B. Waite ("Waite"), Penn Treaty's Chief Financial Officer, in various newspaper articles, press releases and SEC filings. The statements include:

(1) A 1999 article appearing in the Allentown *Morning Call Report* in which Waite stated:

Our growth is indicative of our position as the premier provider in the long-term care insurance marketplace today. We support this growth financially through actuarial review, constant monitoring of operating efficiencies and proven access to the capital markets[.]

(2) A May 1, 2000 Company press release in which Levit stated:

the Company continues "to monitor [its] actuarial results closely in order to preserve the profitability that [its] shareholders deserve."

(3) Throughout 2000, Company supervisors instructed its employees to advise insurance agents, that they had "no information" regarding industry rumors that Penn Treaty was in trouble;

that "everything is okay" with respect to the financial health of the Company; and it was "business as usual" at Penn Treaty.

(4) A July 23, 2000 Allentown *Morning Call Report* article in which Levit stated:

The task of raising money for the future is safe in the hands of management ... We're in a high-growth mode, and we're a public company, and therefore have access to public funds. We are not in trouble.

(5) Also in the July 23, 2000 Allentown *Morning Call Report* article, Levit stated:

Congratulations, we're big enough to be controversial ... I don't understand why we were targeted, but it's sort of a case where you say, talk good or talk bad, just keep talking about us.

(6) An August 8, 2000 Company press release in which Levit stated:

Our focus on expense saving initiatives is reflected in our ongoing operations. We are recognizing more of the value of our premium growth.... By becoming more efficient, we add value to our shareholders, through faster processing, better customer service and improved profitability.

.    .    .    .    .

The nature of long term care is changing. While most of the industry's growth to date has come through the individual market, we believe the group market will become a more significant contributor to future growth. We have already begun to evaluate and target our products, systems and sales approach to take advantage of this expansion in the marketplace.

(7) The August 14, 2000 and November 7, 2000 Company Quarterly Reports stated:

We believe that our insurance subsidiaries' capital and surplus presently meet or exceed the requirements in all jurisdictions in which they are licensed. Our continued growth is dependent upon our ability to (1) continue marketing efforts to expand our historical markets, (2) continue to expand our network of agents and effectively market our products and (3) fund such marketing and expansion while at the same time maintaining minimum statutory levels of capital and surplus required to support such growth. Management believes that the funds necessary to accomplish the foregoing, including funds required to maintain adequate levels of statutory surplus in our insurance subsidiaries, can be met through 2000 by funds generated from non-insurance subsidiary dividends, current and future financial reinsurance transactions, off-shore reinsurance through Penn Treaty (Bermuda) and the availability of our line of credit facility. In the event (1) we fail to maintain minimum loss ratios calculated in accordance with statutory guidelines, (2) we fail to meet other requirements mandated and enforced by regulatory authorities, (3) we have adverse claim experience in the future, (4) we are unable to obtain additional financing to support future growth or (5) the economy continues to affect the buying powers of senior citizens, our results of operations, liquidity and capital resources could be adversely affected.

(8) A November 7, 2000 Company press release stated:

The Company has continued to balance shareholder returns with statutory leverage. Its continued growth, while generating profits for shareholders under generally accepted accounting principles, requires periodic infusions of statutory surplus. Penn Treaty intends to file a Form S–3 with the Securities and Exchange Commission as a precautionary measure allowing it the option to raise funds in the public capital markets to provide statutory surplus to its insurance subsidiaries. The Company is currently examining alternatives to equity capital issuance, including additional debt or financial reinsurance as it has done successfully in the past. Penn Treaty expects to raise additional capital through one or several of these alternatives prior to March 31, 2001.

According to Plaintiffs, these statements were made with knowledge that they were false and misleading, and Plaintiffs relied on them in deciding to buy (or not to sell) Penn Treaty stock. Consequently, the Complaint alleges that these statements constitute a violation of section 10(b) of the Exchange Act and Rule 10b–5.

## II. Standard

### A. Rule 12(b)(6)

When considering a motion to dismiss a complaint under Rule 12(b)(6), a court must primarily consider the allegations contained in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993). The court must accept as true all allegations contained in the complaint and must give the plaintiff the benefit of every favorable inference that can be drawn from those allegations. *See J/H Real Estate v. Abramson*, 901 F.Supp. 952, 955 (E.D.Pa.1995); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). A complaint is properly dismissed only if it appears certain that

the plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief. *See Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Although the fact specific inquiries common to securities cases generally preclude dismissal, courts will nonetheless grant a defendant's 12(b)(6) motion if the alleged misrepresentations or omissions are immaterial or not pled in accordance with Rule 9(b) or the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Dismissal is not appropriate, however, merely because a court disbelieves a complaint's factual allegations. *See Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

## B. Rule 9(b) and the PSLRA

Because 10b–5 claims by necessity involve allegations of fraudulent conduct, courts have long required that they be pled in accordance with Rule 9(b), which provides in pertinent part that in "all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs, through their pleadings, must inject precision and some measure of substantiation into their allegations of fraud. By way of example, allegations describing the relevant who, what, when, where and how such as contained in the first paragraph of any newspaper story, would satisfy the particularity requirement of Rule 9(b). *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir. 1984).

In 1995, in response to debate over the impact of securities fraud litigation, Congress enacted the PSLRA, which substantially modified, among other things, the standard for pleading securities fraud claims. The PSLRA places additional burdens on plaintiffs attempting to plead fraud in securities cases. Under 15 U.S.C.

§ 78u–4(b), a plaintiff alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Failure to meet these pleading requirements results in dismissal. 15 U.S.C. § 78u–4(b)(3).

## III. Discussion

■ To state a securities fraud claim under section 10(b) and rule 10b–5, a private plaintiff must plead the following elements: "(1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999).

Defendants' Motion to Dismiss attacks Plaintiffs' Complaint on four grounds: (1) Plaintiffs' have pled nothing but "fraud by hindsight"; (2) the allegations in the Complaint fail to raise a strong inference of scienter; (3) several of the allegedly false statements are non-actionable expressions of optimism; (4) several of the allegedly false statements are "forward-looking" statements protected under the safe harbor provision of the PSLRA.

## A. Fraud by Hindsight

■ Defendants assert that Plaintiffs' basis for charging Penn Treaty with

knowledge that the statements were false and misleading are Penn Treaty's own admissions in March and April of 2001, announcing that the Company's financial health was in jeopardy and that it was facing regulatory intervention. Defendants argue that a claim for securities fraud does not lie merely because a company discloses, after the fact, that its performance failed to meet expectations.

■ It is true that "Rule 10b–5 liability does not attach merely because '[a]t one time the firm bathes itself in a favorable light' but '[l]ater the firm discloses that things are less rosy.'" *In re Advanta,* 180 F.3d at 538 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)). "Rather, the plaintiff must demonstrate that the loss was attributable to the defendant's fraudulent conduct." *In re Advanta,* 180 F.3d at 538. Thus, if all Plaintiffs plead is the difference between the alleged false and misleading statements in comparison to the admission made by the Company after the financial deterioration, Plaintiffs will not have properly stated a claim constituting a violation of section 10(b) of the Exchange Act and Rule 10b–5 because Plaintiffs will have failed to plead knowledge or recklessness at the times the statements were made.

However, Plaintiffs offer more than hindsight. Plaintiffs point to the severity of the drop in Penn Treaty's major subsidiary, PTNA's, ratio of Total Adjusted Capital to Authorized Control Level Risk Based Capital ("RBC Ratio") and allege that the declining trend in RBC Ratio provided Defendants with knowledge that their statements during the Class Period were materially false and misleading when made. From 1998 to 1999, PTNA's RBC Ratio dropped from 1154% to 335%. In 2000, PTNA's RBC Ratio again dropped from 335% in 1999 to 143% in 2000.

According to Plaintiffs' Complaint, in the face of PTNA's declining RBC Ratio, which sank to a point that impaired investor confidence by dropping below industry norms and ultimately triggering regulatory action, Defendants held the Company out as "the premier provider in the long-term care insurance marketplace" and assured its investors that they were "not in trouble." If the Company truly "monitor[ed][its] actuarial results closely" as it purported to do in a Company press release, then it appears that Defendants should have been aware of the downward trend and taken appropriate action to reverse the decline of its statutory capital and surplus levels in order to avoid regulatory intervention, bad press and the ensuing dramatic drop of its stock price. The only action it appears Defendant took was to paint a picture to the investigating public that the Company's growth was not jeopardizing its financial health, that it was closely monitoring the Company's reserve levels, and that its capital and surplus were adequate for the increased level of business. Plaintiffs complain that the Company painted this picture of confidence while in possession of knowledge allegedly apparent from the declining RBC Ratio that:

(1) defendants could not sustain the Company's "high growth" and simultaneously raise sufficient levels of capital and reserves;

(2) the total adjusted capital of PTNA, the subsidiary that accounted for more than 90% of the Company's business, had rapidly declined and was continuing to fall;

(3) PTNA's ratio of total adjusted capital to authorized control level risk-based capital (the ratio regulators scrutinize to determine whether intervention is necessary) had plummeted to an alarming level;

(4) the capital and surplus levels of PTNA were grossly inadequate, given the level of premium sales during 2000;

(5) defendants were taking desperate measures, such as consummating costly reinsurance deals, dumping securities at huge losses and maneuvering assets, in an effort to increase capital, reduce balance sheet liabilities and reduce the risk-based capital requirement; and

(6) the measures defendants were taking in an effort to address the capital and surplus deficiencies were not sufficient to avoid regulatory intervention and a massive curtailing of the Company's growth rate.

Defendants complain that it is illogical to conclude that because they knew PTNA's RBC Ratio had declined from 1998 to 1999, they knew (or recklessly disregarded) during the Class Period that it would fall to Regulatory Action Level by the end of 2000. However, the Court finds Plaintiffs allegations persuasive. Defendants point out that Regulatory Action Level is not triggered until the RBC Ratio dips below 150% and that PTNA maintained levels well above Regulatory Action Levels until the end of 2000. However, Plaintiffs' Opposition Motion instructs that the drop in RBC Ratio from 1999 to 1998, from 1154% to 335% was enough to set off red flags because companies that desire to maintain good ratings from industry groups such as Standard & Poor's, A & M Best and Moody's typically strive for an RBC Ratio of 350% to 500%. If the Company could not take action to reverse the downward trend, it is potentially misleading to represent itself to the investing public, among other things, as having the ability "to preserve the profitability that [its] shareholders deserve."

Therefore, because of PTNA's declining RBC Ratio, Plaintiffs have pled the requisite scienter and have met Defendants' fraud by hindsight argument.

## B. Scienter

■ In the Third Circuit, scienter may be properly plead "by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.' " *In re Advanta*, 180 F.3d at 534–35 (quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 n. 8 (3d Cir.1997)). As explained in the preceding section, the Court finds Plaintiffs' allegations that the significant drop in PTNA's RBC Ratio had the potential to provide Defendants with knowledge that statements professing the Company's financial health were false or misleading. Therefore, the Court will address Defendants arguments only briefly.

■ Defendants first argue that it is insufficient for Plaintiff to plead that the individual Defendants must have known that their statements were false when made simply because (1) they are senior executives of Penn Treaty; (2) that PTNA is Penn Treaty's largest subsidiary; and (3) the two companies have overlapping management. It is true that "allegations that a securities-fraud defendant, solely because of his position within the company, 'must have known' a statement was false or misleading," are inadequate. *In re Advanta*, 180 F.3d at 539. However, Plaintiffs do not use the facts alleged in their Complaint describing the positions held by Penn Treaty's top executives to establish scienter. Rather, these facts simply establish a foundation as to why Penn Treaty and its top executives would have knowledge of PTNA's financial affairs: because PTNA is Penn Treaty's largest subsidiary

and Penn Treaty's top executives were the same as PTNA's top executives.

Defendants next assert that Plaintiffs' Complaint only alleges that Penn Treaty engaged in an aggressive growth strategy that turned out to be unsuccessful. Defendants argue that such claims grounded in corporate mismanagement are not cognizable under federal law. *In re Advanta*, 180 F.3d at 540. However, Plaintiffs do not allege that the Company is liable simply because it failed in its effort to obtain necessary capital and surplus. The crux of Plaintiffs' Complaint is that instead of taking the necessary action to recoup its depleting capital and surplus, Penn Treaty made efforts to shield the investing public from the fact that the Company was in trouble. Plaintiffs do not complain that Penn Treaty's plan of accounting for the increased risk posed by the Company's growth was not entirely successful. Rather, Plaintiffs complain that due to the three-year decline of PTNA's RBC Ratio, the Company knew long before March 2001 that Defendants could not sustain the Company's high growth and simultaneously raise sufficient levels of capital and reserves and never disclosed this material information to shareholders until it was too late.

Conceivably, PTNA's declining RBC Ratio could establish that Penn Treaty's statements professing its financial health presented a danger of misleading buyers or sellers that was either known to Defendants or was so obvious that Penn Treaty must have been aware of it. *See In re Advanta*, 180 F.3d at 535. Thus, even in light of the PSLRA's heightened requirements for pleading scienter, the Court finds that Plaintiffs have adequately pled "facts giving rise to a strong inference that Defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

## C. Expressions of Optimism

■ Defendants assert that several of the statements identified by Plaintiffs as false and misleading were no more than general statements of corporate optimism. The statements identified by Defendants are:

(1) The Company has continued to balance shareholder returns with statutory leverage;

(2) We're in a high-growth mode, and we're a public company, and therefore have access to public funds. We are not in trouble;

(3) Our focus on expense saving initiatives is reflected in our ongoing operations; and

(4) While most of the industry's growth has come through the individual market, we believe the group market will become a more significant contributor to future growth.

■ Certain vague and general statements of optimism have been held not actionable as a matter of law because they constitute no more than "puffery" and are understood by reasonable investors as such. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 n. 14 (3d Cir. 1997). The puffery defense is particularly appropriate in the context of forward-looking statements, *see id.* and against the backdrop of allegations of fraud by hindsight. *See In re Advanta, supra.*

In an Allentown Morning Call Report dated July 23, 2000, an analyst at Keefe, Bruyette & Woods, Inc. suggested that Penn Treaty had outgrown its capital base and was running out of the money it needed to keep growing. Instead of acknowledging that these capital and surplus problems existed, or remaining silent on the issue, Levit responded, "We are not in trouble." Contrary to Defendants' argument, this statement does not appear to be

vague or generally optimistic, particularly given its context. Plaintiffs' Complaint alleges a variety of statements and material omissions, many of which are not subject to the puffery defense.

### D. Forward–Looking Statements

■ Finally, Defendants argue that most of the false statements alleged in Plaintiffs' Complaint are not actionable because they fall within the statutory safe harbor that protects forward-looking statements when the Plaintiff fails to prove defendant made them with actual knowledge that they were false. Forward-looking statements include (A) statements containing a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure, or other financial items; (B) statements of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; and (C) statements of future economic performance. 15 U.S.C. § 78u–5(i)(1).

■ Defendants identify the statement appearing in the Company's Second and Third Quarter of 2000 as forward-looking because it is a statement regarding future economic performance and management's plans for raising additional capital:

Our continued growth is dependent upon our ability to (1) continue marketing efforts to expand our historical markets, (2) continue to expand our network of agents and effectively market our products and (3) fund such marketing and expansion while at the same time maintaining minimum statutory levels of capital and surplus required to support such growth. Management believes that the funds necessary to accomplish the foregoing, including funds required to maintain adequate levels of statutory surplus in our insurance subsidiaries, can be met

through 2000 by funds generated from non-insurance subsidiary dividends, current and future financial reinsurance transactions, off-shore reinsurance through Penn Treaty (Bermuda) and the availability of our line of credit facility.

However, Defendants do not include the first sentence of the entire paragraph: "We believe that our insurance subsidiaries' capital and surplus presently meet or exceed the requirements in all jurisdictions in which they are licensed." This statement does not qualify as forward-looking. Again, Plaintiffs' Complaint alleges a variety of statements and material omissions, many of which are not forward-looking.

### E. Count II—Claims Against the Individual Defendants

Count II is derivative of Count I and therefore also not dismissed. In Count II, the Complaint alleges that the individual defendants are liable as "control persons" under Section 20(a) of the Exchange Act. Because Plaintiffs have adequately pled a primary violation of the Exchange Act, Defendants' Motion to Dismiss Count II of Plaintiffs' Complaint is also denied.

### IV. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss is denied.

An appropriate Order follows.

### ORDER

AND NOW, this 15th day of May, 2002 upon consideration of Defendants' Motion to Dismiss (Docket No. 8) Plaintiffs' response in opposition thereto (Docket No. 9) and Defendants' reply (Docket No. 11), it is hereby **ORDERED** that Defendants' Motion to Dismiss is **DENIED**.